UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
IMAGEPOINT, INC., and IMAGEPOINT, INC.,        :
by JAMES R. MARTIN, Secured Creditor,

                                               :        12 Civ. 7183 (LAK) (GWG)
                           Plaintiff,

        v.                                     :        REPORT AND
                                                        RECOMMENDATION

JPMORGAN CHASE BANK, NATIONAL                  :
ASSOCIATION,
                           Defendant.          :
------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiffs, identified as "ImagePoint, Inc., and ImagePoint, Inc., by James R. Martin,

Secured Creditor," have brought this action against JPMorgan Chase Bank, National Association

("JPM") for various claims arising out of a contract Imagepoint had entered into with JPM for

the provision of certain services and materials.  JPM now moves to dismiss the second amended

complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  For

the foregoing reasons, this motion should be granted in part and denied in part.

I.      BACKGROUND

        A.      Facts Alleged in the Complaint

        On October 3, 2003, ImagePoint and Wachovia Bank, National Association

("Wachovia") entered into a Loan and Security Agreement in which Wachovia agreed to make

certain loans to ImagePoint.  See Second Amended Complaint, filed July 29, 2013 (Docket # 43)

("2d Am. Compl."), ¶ 8; Loan and Security Agreement, dated Oct. 3, 2003 (annexed as Ex. 3 to

2d Am. Compl) ("Loan & Security").  In exchange for these loans, ImagePoint granted to

Wachovia a security interest in ImagePoint's present and future accounts, contracts, and contract

1

rights, which it referred to as "Collateral."[1]  2d Am. Compl. ¶ 8; Loan & Security § 7.1(a) ("To secure the payment . . . [ImagePoint] hereby mortgages, pledges, and assigns all of the Collateral of [ImagePoint] to [Wachovia] . . . and grants to [Wachovia] . . . a continuing first priority security interests in, and a continuing Lien upon, the Collateral.").  Since that time, Wachovia has been purchased by Wells Fargo.  2d Am. Compl. ¶ 8.[2]

In July 2005, ImagePoint and JPM entered into a Master Procurement Agreement (the "Procurement Agreement"), in which JPM agreed to pay ImagePoint for performing various services and supplying certain materials.  2d Am. Compl. ¶ 3; Master Procurement Agreement, dated July 2005 (annexed as Ex. 1 to 2d Am. Compl.) ("Procurement Agreement").  Pursuant to this agreement, ImagePoint provided JPM with services and materials totaling $802,082.74, but JPM has yet to pay ImagePoint except for a deposit of $39,794.82.  2d Am. Compl. ¶¶ 4-5.  Thus, according to plaintiffs, JPM currently owes ImagePoint $762,287.92 plus interest and attorney's fees.  Id. ¶¶ 6-7.  On March 3, 2009, ImagePoint filed an Involuntary Petition under Chapter 7 of the United States Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Tennessee, and pursuant to 11 U.S.C. § 362(a), an automatic stay of litigation against ImagePoint went into effect.  Id. ¶ 9.  David H. Jones was named as the trustee in the Chapter 7 proceedings.  Id. ¶ 12.

During the pendency of the ImagePoint bankruptcy proceeding, on September 3, 2010,

---

[1] The Loan and Security agreement defined "Collateral" as "all of Borrower's rights, title, and interest in and to each of the following . . . wherever located and whether now or hereafter existing or now owned or hereafter acquired or arising: (a) all Accounts, (b) all Chattel Paper, (c) all Contracts, (d) all Contract Rights . . . ."  Loan & Security § 1.1 at 6.

[2] Because the distinction between Wachovia and Wells Fargo is of no consequence for this motion, we refer to the relevant entity simply as "Wachovia" whether discussing it before or after its acquisition by Wells Fargo.

2

Wachovia entered into an Assignment, Amendment, and Settlement Agreement (the "AASA"), in which it assigned its rights and interests under the Loan and Security Agreement, including any rights to ImagePoint's collateral, to James A. Haslam III.  See id. ¶ 10; Assignment, Amendment and Settlement Agreement, dated Sept. 3, 2010 (annexed as Ex. 4 to 2d Am. Compl.) ("AASA"), § 3(a) ("Existing Lender [Wachovia] hereby sells, transfers and assigns to Haslam, and Haslam hereby purchases, assumes . . . all right, title and interest of Existing Lender in and to, and all obligations of Existing Lender under, the Loan Agreement.").  Thus, Haslam purportedly received Wachovia's security interest in ImagePoint's accounts receivable for the goods and services ImagePoint provided to JPM under the Procurement Agreement.  See 2d Am. Compl. ¶ 10.  On April 8, 2011, Haslam assigned these same rights in the accounts receivable to Martin.  See id. ¶ 11; Assignment, dated Apr. 8, 2011 (annexed as Ex. 5 to 2d Am. Compl.).

On January 28, 2012, Martin entered into a settlement agreement with Jones (the trustee for ImagePoint) and Jones' attorneys in which Martin was granted the right to obtain from the bankruptcy court an order for "stay relief" with respect to "all collateral securing his claim, which Martin as officer of the Debtor and as Agent under the Loan Agreement identifies in the Schedule A attached hereto as a complete list of all [the] collateral of which Martin is presently aware . . . ."  See 2d Am. Compl. ¶ 12; Settlement Agreement, dated Jan. 28, 2012 (annexed as Ex. 6 to 2d Am. Compl.) ("January 28 Settlement Agreement"), at 3.  Schedule A of the Settlement Agreement listed various kinds of property, including several bankruptcy court adversary proceedings, one of which is the adversary proceeding against JPM.  See 2d Am. Compl. ¶ 12; January 28 Settlement Agreement at 17.

On January 31, 2012, Martin and Jones filed a joint motion for approval of the settlement agreement with the bankruptcy court, 2d Am. Compl. ¶ 13, and on February 14, 2012, the

bankruptcy court issued an order approving the settlement agreement, id. ¶ 14; Order Granting

Joint Motion for Approval of Settlement Agreement, filed Feb. 14, 2012 (annexed as Ex. 7 to 2d

Am. Compl.) ("Settlement Order").  Counsel for JPM "approved" the entry of this order.  See

Settlement Order at 4.  The bankruptcy court's order acknowledged, "[n]otwithstanding any term

of the Settlement Agreement or this Order which may appear to the contrary, no rights nor

remedies of JPMorgan shall be impaired or prejudiced by the Settlement Agreement or this

Order, except as provided in paragraph (B) hereinbelow."  Id. at 1-2.  Paragraph (B) provided

that "in the event Martin decides to drop his claim against a Defendant . . . the Defendant's

claims (or counterclaims) against the estate must be liquidated in the bankruptcy court through

the claims process."  Id. at 2.

On March 2, 2012, the bankruptcy court entered a second order in which it modified the

automatic stay under 11 U.S.C. § 362(a) "to permit James R. Martin to enforce his rights as a

secured creditor under the Loan and Security Agreement, dated October 3, 2003, between

ImagePoint, Inc. and Wachovia."  See 2d Am. Compl. ¶ 15; Agreed Order Granting Second

Motion of James R. Martin for Relief from Stay, filed Mar. 2, 2012 (annexed as Ex. 8 to 2d Am.

Compl.), at 2.  Counsel for JPM approved the entry of this order.  See id. at 4.  Once again, the

order stated that "[n]otwithstanding any other provision of the present Order which may appear

to the contrary, the rights and remedies of JPMorgan Chase Bank, National Association, as

protected in the [prior settlement order], shall not be prejudiced in any way by the present Order

or its entry."  Id. at 2.

On July 20, 2012, a hearing was held in bankruptcy court regarding JPM's motion to

dismiss a collection action that had Martin brought against JPM.  See 2d Am. Compl. ¶ 16.  At

this hearing, the bankruptcy court acknowledged that the trustee had consented in the settlement

4

agreement to allow Martin to pursue this action in ImagePoint's name.  See id.  The bankruptcy

court summarized JPM's argument that the action must be dismissed for lack of subject matter

jurisdiction because of "the fact that Mr. Martin has been granted stay relief and the unlikelihood

that the action will produce any benefit for unsecured creditors."  Id.; Transcript of Bankruptcy

Court Hearing, dated July 20, 2012 (annexed as Ex. 9 to 2d Am. Compl.) ("7/20/12 Tr."), at 16.

The bankruptcy court then noted that "neither the parties, nor the Court have been able to locate

a decision where the secured creditor after obtaining relief from the automatic stay was

permitted to step into the shoes of the trustee and pursue a Section 542(b) turnover action" and

therefore concluded that "[t]here is either a lack of standing by the secured creditor, or a lack of

jurisdiction.  In either event, dismissal is required."  7/20/12 Tr. at 19.  On August 2, 2012, the

bankruptcy court entered an order granting JPM's motion to dismiss.  2d Am Compl. ¶ 17.  The

bankruptcy court reasoned that either Martin lacked standing because "the Trustee has

independent standing to pursue a Section 542 turnover action," or alternatively, if the proceeding

"merely [was] an accounts receivable collection effort by a secured creditor," there was no

subject matter jurisdiction over the action.

     B.    <u>Procedural History</u>

     Shortly thereafter, on September 24, 2012, ImagePoint filed the original complaint in this

action, alleging that defendant JPM was liable for breach of the Procurement Agreement and for

unjust enrichment.  See Complaint, filed Sept. 24, 2012 (Docket # 1).  On October 19, 2012,

JPM answered, asserting that ImagePoint lacked standing to bring this suit.  See Answer, filed

Oct. 19, 2012 (Docket # 4), ¶¶ 24-25.  On November 30, 2012, ImagePoint, now joined by

Martin, filed the first amended complaint.  See First Amended Complaint, filed Nov. 30, 2012

(Docket # 13).  On December 19, 2012, JPM filed a motion to dismiss the first amended

complaint, alleging <u>inter alia</u> that Martin did not have standing to bring suit against JPM because any assignment to Martin was null and void.  <u>See</u> Notice of Motion, filed Dec. 19, 2012 (Docket # 21); Defendant's Memorandum of Law in Support of Motion to Dismiss First Amended Complaint, filed Dec. 19, 2012 (Docket # 22), at 7.  Following oral argument on July 9, 2013, <u>see</u> Transcript, filed Sept. 26, 2013 (Docket # 50), this Court issued an order granting plaintiffs leave to amend their complaint for a second time, <u>see</u> Order, filed July 10, 2013 (Docket # 42).

On July 29, 2013, plaintiffs ImagePoint, Inc., and "ImagePoint, Inc., by James R. Martin, Secured Creditor" filed the second amended complaint against defendant JPM.  <u>See</u> 2d Am. Compl.  In addition to asserting breach of contract and unjust enrichment claims against JPM, <u>see id.</u> ¶¶ 25-28, plaintiffs allege in the second amended complaint that Martin has the right pursuant to New York Uniform Commercial Code ("N.Y. U.C.C.") § 9-607(a)(1) to foreclose on the security interest in the accounts receivable owed to ImagePoint under the Procurement Agreement, <u>see id.</u> ¶¶ 18-24.  Plaintiffs further claim that Martin has proceeded in a "commercially reasonable manner," as required by N.Y. U.C.C. § 9-607(c), because Martin has made demands on JPM for the amounts due, JPM has ignored those demands, and Martin first attempted to collect on the amounts due in bankruptcy court.  <u>Id.</u> ¶ 24.

On September 10, 2013, JPM filed the instant motion to dismiss the second amended complaint under Fed. R. Civ. Pro. Rule 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim.[3]

---

[3] <u>See</u> Notice of Motion, filed Sept. 10, 2013 (Docket # 47); Defendant's Memorandum of Law in Support of Motion to Dismiss Second Amended Complaint, filed Sept. 10, 2013 (Docket # 48) ("Def. Mem."); Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Second Amended Complaint, filed Oct. 4, 2013 (Docket # 52) ("Pl. Mem."); Declaration of Shujah A. Awan, filed Oct. 4, 2013 (annexed to Pl. Mem.) ("Awan Decl."); Defendant's Memorandum of Law in Further Support of its Motion to Dismiss Second Amended

II.     DISCUSSION

    A.     Standing

  JPM asserts that plaintiffs' claims should be dismissed for lack of subject matter

jurisdiction because Martin does not have standing to pursue his claims.  See Def. Mem. at 7.

    "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v.

United States, 201 F.3d 110, 113 (2d Cir. 2000).  A party asserting that a court has subject matter

jurisdiction bears the burden of proving by a preponderance of the evidence that it exists.  Id.

at 113; accord Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 130

S. Ct. 2869 (2010); see also Whitmore v. Arkansas, 495 U.S. 149, 154 (1990) ("It is well

established . . . that before a federal court can consider the merits of a legal claim, the person

seeking to invoke the jurisdiction of the court must establish the requisite standing to sue.").  In

considering such a motion, a court "may refer to evidence outside the pleading."  Makarova, 201

F.3d at 113; accord Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)

("[W]hen . . . subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter

may be presented by affidavit or otherwise."); TradeComet.com LLC v. Google, Inc., 693 F.

Supp. 2d 370, 375 n.3 (S.D.N.Y. 2010).

    Under Article III of the United States Constitution, federal courts may hear only

_____

Complaint, filed Oct. 28, 2013 (Docket # 54) ("Def. Reply").  In response to a request from the
Court, the parties submitted additional briefing.  See Plaintiffs' Supplemental Memorandum of
Law in Opposition to Defendant's Motion to Dismiss Second Amended Complaint, filed Jan. 20,
2014 (Docket # 59) ("Pl. Supp. Mem."); Defendant's Supplemental Letter Brief, filed Jan. 22,
2014 (Docket # 60) ("Def. Supp. Mem."); Plaintiffs' Response to Defendant's Supplemental
Letter Brief in Further Support of Motion to Dismiss Second Amended Complaint, filed Jan. 30,
2014 (Docket # 61) ("Pl. Supp. Reply"); Defendant's Supplemental Response Letter Brief, filed
Jan. 30, 2014 (Docket # 62) ("Def. Supp. Reply").

"[c]ases" and "[c]ontroversies."  U.S. Const. art. III, § 2, cl. 1.  Thus, "[i]f plaintiffs lack Article

III standing, a court has no subject matter jurisdiction to hear their claim."  Cent. States Se. &

Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 198

(2d Cir. 2005); accord Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 69 (2d Cir. 2001).  "A

case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the

district court lacks the statutory or constitutional power to adjudicate it."  Makarova, 201 F.3d

at 113 (citing Fed. R. Civ. P. 12(b)(1)).

> To meet the Article III standing requirement, a plaintiff must show:
>
> [1] that he "suffered an injury-in-fact — an invasion of a legally protected interest which
> is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or
> hypothetical"; [2] that there was a "causal connection between the injury and the conduct
> complained of"; and [3] that it is "likely, as opposed to merely speculative, that the injury
> will be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. 555,
> [560-61] (1992) (citations and internal quotation marks omitted).  "[E]ach element [of
> standing] must be supported in the same way as any other matter on which the plaintiff
> bears the burden of proof, i.e., with the manner and degree of evidence required at the
> successive stages of the litigation."  Id. at 561.

Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010).

JPM argues that Martin does not have standing in this case because there were "three

independent and insurmountable defects in [Martin's] purported chain of assignment," and thus,

Martin cannot establish that he is a "real-party-in-interest" who has a right to payment under the

Procurement Agreement.  Def Mem. at 1; see also id. at 8-11; Def. Reply at 6-10.  According to

JPM, any one of these defects is sufficient to break the chain of assignment from ImagePoint to

Martin, thus leaving Martin without any interest in the receivables and therefore no standing to

pursue this case.  See Def. Mem. at 11.  In supplemental memoranda, JPM makes the related

argument that Martin lacks standing because he has failed to perfect whatever interest he might

have under the Procurement Agreement.  See Def. Supp. Mem. at 5; Def. Supp. Reply at 5.

We address each of the assignments in turn.

1.     Whether the First Assignment Was Valid

"'An assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, or chattel, or other thing.'" De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 320 (S.D.N.Y. 2013) (quoting In re Stralem, 303 A.D.2d 120, 122 (2d Dep't. 2003)). An assignee "stands in the shoes" of an assignor and thus acquires the assignor's right "to bring suit for collection of monies owed to the assignor." Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 966 F. Supp. 2d 270, 279-80 (S.D.N.Y. 2013) (citing Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 284–85 (2008)). "[A]n assignee for collection may properly sue on the assigned claim in federal court." Sprint Commc'ns Co., 554 U.S. at 284. JPM argues that Martin lacks standing because "[a]lthough Plaintiffs assert in conclusory fashion that Martin was assigned an interest in the Receivable, the Incorporated Documents establish three independently fatal defects in the links of Plaintiffs' purported chain of the Receivable's assignment." Def. Mem. at 9.

As previously discussed, in 2003 ImagePoint granted to Wachovia a security interest in its collateral, including present and future accounts, by way of the Loan and Security Agreement. See 2d Am. Compl. ¶ 8; Loan & Security § 7.1(a). Subsequently, in 2005, ImagePoint entered into the Procurement Agreement with JPM, in which JPM was obligated to pay ImagePoint for the provision of certain services and materials. See 2d Am. Compl. ¶ 3; Procurement Agreement. Despite the fact that Wachovia's security interest in ImagePoint's collateral pre-dated the Procurement Agreement, JPM now argues that an anti-assignment clause in the Procurement Agreement prevented Wachovia from obtaining ImagePoint's interest in the JPM

9

accounts receivable.  Def. Mem. at 9.  The clause in the Procurement Agreement states: "Neither party may assign any rights or delegate any obligations under this Agreement without the prior written consent of the other party . . . . Any assignment or attempted assignment contrary to this Section 14.2 will be a material breach of this Agreement and null and void."  See id. (quoting Procurement Agreement § 14.2).  Thus, in JPM's view, because JPM never provided its written consent to allow ImagePoint to assign its rights to payment under the Procurement Agreement to Wachovia, the purported assignment was unenforceable.  Id. at 10.

Plaintiffs do not contend that ImagePoint obtained JPM's written consent.  Rather, they argue that the anti-assignment provision "ha[d] no effect on Martin's security interest, because ImagePoint did not purport to assign any rights under the Procurement Agreement."  Pl. Supp. Mem. at 2.  In plaintiffs' view, when ImagePoint entered into the Loan and Security Agreement with Wachovia in 2003, ImagePoint did not "assign" the rights to its accounts; instead, it created a security interest giving Wachovia (and thus ultimately Martin) an independent right to collect upon ImagePoint's present and future collateral under N.Y. U.C.C. Article 9 — specifically N.Y. U.C.C. § 9-607(a)(3).  See Pl. Mem. at 10-12.

Under N.Y. U.C.C. § 9-607(a)(3), a secured party "may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor . . . to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral."  Additionally, N.Y. U.C.C. § 9-406(d)(1) states: "Except as otherwise provided . . . a term in an agreement between an account debtor and an assignor . . . is ineffective to the extent that it: (1) prohibits, restricts, or requires the consent of the account debtor . . . to the assignment or transfer of, or the creation,

10

attachment, perfection, or enforcement of a security interest in, the account, chattel paper . . . ."

According to plaintiffs, because Wachovia had a preexisting security interest in ImagePoint's future accounts at the time ImagePoint entered into the Procurement Agreement with JPM, "Martin's right to recover under Section 9-607 is not based on an assignment of rights under the Procurement Agreement [and consequently] is unaffected by any purported limitation in that agreement." See Pl. Mem. at 11. In response to this argument, JPM contends that Martin's alleged security interest falls outside the scope of N.Y. U.C.C. Article 9 because Martin's interest is "expressly exclude[d]" under N.Y. U.C.C. § 9-109(d). See Def. Supp. Reply at 2-3. In the alternative, JPM asserts that, even if N.Y. U.C.C. Article 9 did apply to Martin's secured interest, "[c]ourts have consistently held that [N.Y. U.C.C. § 9-607] does not grant a secured creditor the right to assert claims against an account debtor." Def. Supp. Mem. at 2.

In light of these arguments, it appears that the parties have raised three distinct issues regarding the validity of the alleged assignment from ImagePoint to Wachovia: (1) whether the interest that ImagePoint granted to Wachovia in the Loan and Security Agreement constitutes a secured transaction governed by Article 9 of the N.Y. U.C.C.; (2) whether, assuming Article 9 applies, it provides secured creditors like Wachovia (or Martin as assignee) with the means to assert claims against account debtors like JPM; and (3) whether, assuming Article 9 applies, the anti-assignment provision in the Procurement Agreement affected Wachovia's security interest.

i.    Whether Article 9 Applies

In general, Article 9 applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." N.Y. U.C.C. § 9-109(a)(1).[4] As

---

[4] While the N.Y. U.C.C. does not define "personal property," it is typically understood that personal property includes accounts receivable. See Interworks Sys. Inc. v. Merch. Fin.

such, ImagePoint's grant to Wachovia of a "continuing first priority security interest in, and a continuing Lien upon, [ImagePoint's] Collateral," Loan & Security § 7.1(a), falls squarely within the scope of Article 9.  JPM, however, contends that certain exceptions to this provision apply here.  Specifically, JPM cites N.Y. U.C.C. §§ 9-109(d)(5) and 9-109(d)(7), which in JPM's view, "expressly exclude[ ] the alleged assignment of the Accounts Receivable from the coverage of . . . Article 9."  Def. Supp. Reply at 2.  Under N.Y. U.C.C. § 9-109(d)(5), Article 9 does not apply to "an assignment of accounts, chattel paper, payment intangible, or promissory notes which is for the purpose of collection only."  Similarly, N.Y. U.C.C. § 9-109(d)(7) carves out an exception for "an assignment of a single account, payment intangible, or promissory note to an assignee in full or partial satisfaction of a preexisting indebtedness."  JPM contends both that the "purported assignment of ImagePoint's accounts receivable to Martin is 'merely an accounts receivable collection effort'" and that "the alleged assignment of the Accounts Receivable constitutes an assignment in 'full or partial satisfaction' of ImagePoint's preexisting indebtedness to Wachovia under the Loan and Security Agreement."  Def. Supp. Reply at 2. JPM equates this situation to <u>Filer, Inc. v. Staples, Inc.</u>, 766 F. Supp. 2d 314, 317 (D. Mass. 2011), in which the court found that because the "assignment . . . is for the purpose of collection, in satisfaction of a pre-existing indebtedness, it is not subject to Article 9 of the U.C.C."

We disagree.  First, the Loan and Security Agreement itself reflects that the security interest was not granted in satisfaction of a preexisting debt.  Instead, the assignment of ImagePoint's collateral to Wachovia was made "[t]o secure the payment, observance and

---

<u>Corp.</u>, 604 F.3d 692, 696 (2d Cir. 2010) (a corporation's "personal property" included its "accounts receivable").  <u>See</u> <u>also</u> N.Y. U.C.C. § 9-109 cmt. 12 ("In general this Article covers security interests in (including sales of) accounts . . . .").

performance of the Secured Obligations," Loan & Security § 7.1(a), which consisted of "the principal of, and interest and premium, if any, on, the Revolving Credit Loans" that were authorized pursuant to the agreement, id. § 1.1 at 28.  In other words, by granting Wachovia an interest in its collateral, ImagePoint was providing it with security for the repayment of loans ImagePoint intended to accept pursuant to the Loan and Security Agreement.  In Filer, by contrast, the assignor assigned its rights and interests in an account receivable in exchange for the assignee's relinquishment of "all debts owed to it."  766 F. Supp. 2d at 317 n.3.  Thus, the N.Y. U.C.C. § 9-109(d)(7) "preexisting indebtedness" exception does not apply.

As for the § 9-109(d)(5) "purpose of collection only" exception, there is no evidence that Wachovia accepted the security interest in the accounts receivable only for the purpose of undertaking collection activity.  In interpreting Delaware's version of this provision, the court in Bramble Transp., Inc. v. Sam Senter Sales, Inc., 294 A.2d 97, 101 (Del. Super. 1971), noted that "this exclusion is for the purpose of removing from the Code assignments of a non-commercial nature such as those to a collection agency for the sole purpose of facilitating collection of the debt . . . [and] [i]t does not purport to exclude transactions generally considered 'financing in nature.'"  Similarly, Matter of Biloxi Prestress Concrete, Inc., 98 F.3d 204, 208 (5th Cir. 1996), held that a under an analogous provision to N.Y. U.C.C. § 9-109(d)(5), "transactions relating to the creation or perfection of security interests, rather than to assignments of receivables for collection, . . . remain subject to the provisions of Article 9."  See also Brookridge Funding Corp. v. Nw. Human Servs., 175 F. Supp. 2d 355, 361 (D. Conn. 2001) ("The applicability of Article 9 is further supported by the fact that the Accounts Receivable Agreement provided that [plaintiff] would have a security interest in [debtor's] accounts.").  An "Official Comment" to N.Y. U.C.C. § 9-109 similarly acknowledges that the purpose of § 9-109(d) is to "exclude from

13

the Article certain sales and assignments of receivables that, by their nature, do not concern commercial financing transactions."  N.Y. U.C.C. § 9-109 cmt. 12.

In our case, the very purpose of the Loan and Security Agreement was to "make . . . available to [ImagePoint] a revolving credit facility in an aggregate amount up to $27,500,000 . . . ."  See Loan & Security Preamble.  Thus, Wachovia's security interest was directly related to a "commercial financing transaction" and was not solely for the purpose of collection, as that concept has been interpreted in case law.   The Agreement established that Wachovia would receive not merely a right to receive repayment of its loans but also a security interest to ensure that repayment.  Additionally, the fact that the Agreement created a security interest in "all of the Collateral of Borrower," id. § 7.1(a), not just a particular account or income stream, strongly suggests that the primary effect of the provision was to secure the loan.  Therefore, because the security interest granted to Wachovia was not "an assignment of accounts . . . which is for the purpose of collection only" under N.Y. U.C.C. § 9-109(d)(5), the Loan and Security Agreement is governed by Article 9.

ii.    Whether Article 9 Provide Recourse

N.Y. U.C.C. § 9-607(a)(3) provides that a secured party has the right to "enforce the obligations of an account debtor . . . and exercise the rights of the debtor with respect to the obligation of the account debtor . . . to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor."  Thus, the provision by its terms gives the secured party — here, Martin as assignee of Wachovia — the right to sue the account debtor, JPM, to enforce the obligations that the JPM owes to the

14

debtor, ImagePoint.[5]  JPM argues, however, that § 9-607(e) prevents secured creditors from

collecting from account debtors like JPM.  See Def. Supp. Mem. at 2.  N.Y. U.C.C. § 9-607(e)

states that "[t]his Section does not determine whether an account debtor, bank, or other person

obligated on collateral owes a duty to a secured party."  On its face, the language of § 9-607(e)

imposes no limitation on the remedy provided in § 9-607(a)(3).  It merely states that §9-607 does

not create any obligation to a secured party.  But the obligation that Martin purports to sue on

was not created by Article 9 but rather consists of an obligation contained in the original contract

between Imagepoint and JPM — that is, JPM's debt to ImagePoint under the Procurement

Agreement.

　　　　JPM points to two cases in support of its view that  § 9-607(e) prevents Martin from

enforcing that obligation.  In the first case, Buckeye Ret. Co., LLC, Ltd. v. Meijer, Inc., 2008

WL 4278038 (Mich. App. Sept. 18, 2008), the debtor defaulted on its loan and the secured party

attempted to collect on the debtor's obligation by demanding of an account debtor that it "hold

all future receivable amounts due to [the debtor] in escrow until there is a resolution of the

current litigation between" the secured party and the debtor.  Id., at *2.  Notwithstanding this

instruction, the account debtor continued to pay the debtor because the debtor had told the

account debtor that the secured party was "not entitled to any payment" from the account debtor.

Id.  The secured party brought suit against the debtor, arguing that it had the legal right to collect

the debtor's collateral "upon demand" pursuant to Michigan's analogous § 9-607 provision.  Id.,

---

　　　　　[5] N.Y. U.C.C. § 9-102(a)(72)(A) defines "secured party" as "a person in whose favor a
security interest is created or provided for under a security agreement, whether or not any
obligation to be secured is outstanding."  N.Y. U.C.C. § 9-102(a)(3) defines "account debtor" as
"a person obligated on an account, chattel paper, or general intangible."  N.Y. U.C.C.
§ 9-102(a)(28)(A) defines "debtor" as "a person having an interest, other than a security interest
or other lien, in the collateral, whether or not the person is an obligor."

at *6.  The court denied the secured party's claim and found § 9-607 to be inapplicable because it only establishes "the baseline rights of the secured party vis-a-vis the debtor."  Id.

In situations like Buckeye, where there is a dispute between the secured creditor and the debtor as to who has the right to collect from an account debtor, the secured creditor cannot be said to be "exercis[ing] the rights of the debtor with respect to the obligation of the account debtor."  See N.Y. U.C.C. § 9-607(a)(3).  In other words, to hold that an account debtor is obligated to pay the secured creditor and not the debtor would be tantamount to creating a duty owed by the account debtor to the secured creditor that was separate and distinct from the duty it owed to the debtor.  Such a result is barred by the plain language of § 9-607(e), which states that the secured party's right to collect from an account debtor "does not determine whether an account debtor . . . owes a duty to a secured party."

In our case, Martin is not asking us to look to § 9-607 to find that JPM owes any independent duty to Martin to allow him to enforce ImagePoint's rights under the Procurement Agreement.  Rather, Martin is asking JPM to simply fulfill its obligations to ImagePoint under the Procurement Agreement — an action which is explicitly permitted by N.Y. U.C.C. § 9-607(a)(3).  An "Official Comment" to this provision confirms this distinction:

> This section permits a secured party to collect and enforce obligations included in collateral in its capacity as a secured party.  It is not necessary for a secured party first to become the owner of the collateral pursuant to a disposition or acceptance.  However, the secured party's rights, as between it and the debtor, to collect from and enforce collateral against account debtors and others obligated on collateral . . . are subject to . . . other applicable law . . . . This section establishes only the baseline rights of the secured party vis-a-vis the debtor — the secured party is entitled to enforce and collect after default or earlier if so agreed.

N.Y. U.C.C. § 9-607 cmt. 6.  Thus, Buckeye is distinguishable from our case because the court was being asked to recognize a duty owed by the account debtor to a secured party that was

16

independent from the account debtor's duty to the debtor.  Here, the secured party is simply
asking the court to enforce the duty that the account creditor already owes to the debtor.

The other case that JPM cites, McCullough v. Goodrich & Pennington Mortg. Fund, Inc.,
644 S.E.2d 43 (S.C. 2007), is also inapposite.  In McCullough, the court relied on § 9-607(e) to
find that Article 9 did not recognize "a duty upon which a secured creditor may bring an
independent action against a third party for negligent impairment of collateral."  Id. at 53.  The
court discussed the distinction between a secured creditor's enforcement of the debtor's right to
recover against the account debtor, which is authorized by § 9-607(a)(3), and a secured
creditor's assertion of a claim against the account debtor premised on an independent right of
recovery, which is not.  The court stated: "While [ 9-607(a)(3)] appears to permit subrogation of
the debtor's rights to the secured party — which could include a claim for damage or destruction
to the collateral — it does not purport to permit a separate and independent tort claim by the
secured party . . . ."  Id. at 53-54.  Because Martin is not seeking to pursue an independent claim
of any kind, let alone a tort claim, the holding of McCullough is irrelevant to this case.  Notably,
McCullough specifically recognizes that § 9-607 authorizes the "subrogation" of a debtor's
rights by a secured creditor, which is precisely what is being pursued here.

Furthermore, as plaintiffs have noted, case law routinely recognizes that secured creditors
have the right to collect from account debtors pursuant to § 9-607(a)(3).  For example, in
Agri-Best Holdings, LLC v. Atlanta Cattle Exch., Inc., 812 F. Supp. 2d 898, 901 (N.D. Ill.
2011), the court acknowledged that, where the debtor "defaulted on its indebtedness to its
secured creditor," the secured creditor was entitled to "enforce the obligations of" the account
debtor and "'exercise the rights' of [the debtor] by pursuing [a] lawsuit."  Mecco, Inc. v. Capital
Hardware Supply, Inc., 486 F. Supp. 2d 537, 546 (D. Md. 2007), held that when a debtor

defaulted, the secured creditor "had the right to step into [the debtor's] shoes and enforce the obligations of its account debtors."  Similarly, in Wells Fargo Bank Nat. Ass'n v. Kal-Rich, Inc., 2010 WL 1740603, at *3 (Mass. App. Div. Apr. 26, 2010), the court found that "Wells Fargo, as a secured party whose debtor . . . was in default, had the right to enforce its security interest in [the debtor's] accounts receivable against . . . the account debtor."

Finally, JPM argues for the first time in its supplemental reply letter that Martin cannot recover from JPM because JPM never received notice and proof of the assignment as required by N.Y. U.C.C. §§ 9-406(a) and 9-406(c).  See Def. Supp. Reply at 3-4.  However, as explained in the "Official Comments" for § 9-406, these provisions do not operate to bar an assignee from collecting from an account debtor; rather, they simply give the account debtor the option to continue paying the assignor until such notice and proof of the assignment is provided.  See N.Y. U.C.C. § 9-406 cmt. 2 ("Subsection (a) provides the general rule concerning an account debtor's right to pay the assignor until the account debtor receives appropriate notification."); N.Y. U.C.C. § 9-406 cmt. 4 ("Even if the proof is not forthcoming, the notification of assignment would remain effective, so that, in the absence of reasonable proof of the assignment, the account debtor could discharge the obligation by paying either the assignee or the assignor."). Here, because JPM has not asserted that it has fulfilled its obligation to the original assignor, ImagePoint, it makes no difference under N.Y. U.C.C. § 9-406 whether or not it has received adequate notification of the assignment.  See generally Pioneer Commercial Funding Corp. v. United Airlines, Inc., 122 B.R. 871, 882 (S.D.N.Y. 1991) (noting that the predecessor provision to N.Y. U.C.C. § 9-406 "is designed to prevent a debtor from being forced to pay twice . . . but in no way does it excuse the debtor from meeting its obligation"); Gen. Motors Acceptance Corp. v. Albany Water Bd., 187 A.D.2d 894, 896 (3d Dep't 1992) (under predecessor provision

to N.Y. U.C.C. § 9-406 "one who pays his or her indebtedness to the assignor in ignorance of the assignment is relieved from all liability to the assignee"). None of the cases that JPM has cited on this point hold to the contrary.

For these reasons, Martin as secured creditor has authority pursuant to N.Y. U.C.C. § 9-607(a)(3) to enforce ImagePoint's rights by collecting from JPM.

### iii.    Effect of the Anti-Assignment Provision

Having found that the Loan and Security Agreement granted Wachovia a security interest that was subject to Article 9, we now address whether the statutory right to enforce this security interest was affected by the anti-assignment provision in the Procurement Agreement that was subsequently entered into by ImagePoint and JPM. This issue essentially boils down to a determination of whether an anti-assignment clause can affect a third party's prior existing security interest in future accounts receivable. JPM makes two arguments as to why the anti-assignment clause in the Procurement Agreement invalidated any attempt by ImagePoint to transfer its interests in the JPM account to Wachovia or to any of the subsequent assignees. First, JPM points to the "Official Comment" to N.Y. U.C.C. § 9-607, which states in part, "the secured party's rights, as between it and the debtor, to collect from and enforce collateral against account debtors . . . are subject to . . . other applicable law." N.Y. U.C.C. § 9-607 cmt. 6. Relying exclusively on this statement, JPM argues that "Martin's purported right to collect on the accounts receivable . . . remains subject to 'other' applicable New York law . . . [which recognizes that] a contract provision prohibiting the assignment of rights arising under the contract, without written consent of the other party, is a complete and enforceable restriction of the right to assign." Def. Supp. Mem. at 3. Second, JPM argues that, because "a secured party . . . stands as an 'assignee' of a debtor's interest in any specified collateral," and because

19

an assignee's rights under a contract are subject to defenses that could have been asserted against the assignor, Wachovia must have taken on the Procurement Agreement subject to the anti-assignment clause, and thus, any subsequent assignment by Wachovia was null and void.  See Def. Supp. Reply at 4.

In response to these arguments, plaintiffs contend that "the secured party (Wachovia) already stood in the shoes of the debtor (ImagePoint) with respect to the collateral (the accounts receivable), by operation of N.Y. U.C.C. § 9-607(a)(3), when the Procurement Agreement was entered into, without any need for further assignment of ImagePoint's rights under the Procurement Agreement."  See Pl. Supp. Mem. at 3.  Thus, because there was in actuality no assignment, the anti-assignment provision "had no impact on the rights Wachovia already had as the secured creditor of ImagePoint."  Id.

More to the point, however, JPM's argument is foreclosed by the plain and specific language of N.Y. U.C.C. § 9-406(d)(1), which states, "[e]xcept as otherwise provided . . . a term in an agreement between an account debtor and an assignor . . . is ineffective to the extent that it: (1) prohibits, restricts, or requires the consent of the account debtor . . . to the assignment or transfer of, or the creation, attachment, perfection, or enforcement of a security interest in, the account, chattel paper, . . . ."  As the "Official Comment" to this provision explains:

> Former Section 9-318(4) rendered ineffective an agreement between an account debtor and an assignor which prohibited assignment of an account (whether outright or to secure an obligation) . . . . Subsection (d) essentially follows former Section 9-318(4), but expands the rule of free assignability . . . and explicitly overrides both restrictions and prohibitions of assignment.  The policies underlying the ineffectiveness of contractual restrictions under this section build on common-law developments that essentially have eliminated legal restrictions on assignments of rights to payment as security and other assignments of rights to payment such as accounts . . . . Like former Section 9-318(4), subsection (d) provides that anti-assignment clauses are "ineffective."  The quoted term means that the clause is of no effect whatsoever; the clause does not prevent the assignment from taking effect between the parties and the prohibited assignment does not

constitute a default under the agreement between the account debtor and assignor . . . .

 N.Y. U.C.C. § 9-406 cmt. 5.

Here, the anti-assignment clause in the Procurement Agreement falls under the purview

of this rule.  First, as we have previously discussed, ImagePoint is the "assignor" with respect to

the relevant security interest and JPM is the "account debtor."  Second, the anti-assignment

clause, which states "[n]either party may assign any rights or delegate any obligations under this

Agreement, without the prior written consent of the other party," see Procurement Agreement

§ 14.2, is a strict prohibition on assignment absent consent.  Thus, under the plain language of

§ 9-406(d)(1), the anti-assignment clause in the Procurement Agreement is rendered

"ineffective."

Furthermore, case law makes clear that under former § 9-318(4), which the Official

Comments recognize as having roughly the same scope as N.Y. U.C.C. § 9-406(d)(1), anti-

assignment clauses like the one in the Procurement Agreement are invalid.  For example, in

Quantum Corp. Funding, Ltd. v. Fidelity & Deposit Co. of Md., 258 A.D.2d 376, 378 (1st Dep't

1999), the court found that a clause prohibiting assignment without prior written consent did not

bar the assignment because § 9-318(4) "renders void any term in a contract between an account

debtor and an assignor prohibiting assignment of an account or the creation of a security interest

or requiring prior consent to assignment or the creation of a security interest."  Similarly, in

Aetna Cas. & Sur. Co. v. Bedford-Stuyvesant Restoration Const. Corp., 90 A.D.2d 474, 475 (1st

Dep't 1982), the court found that under § 9-318(4), "the provision of the subcontract purporting

to prohibit without written consent the assignment . . . of any proceeds or interest to the

subcontract is legally ineffective."  Even in Filer, one of the cases that JPM has cited, the court

acknowledged that if the relevant transaction fell within the scope of Article 9 that the anti-

assignment clause would be "rendered unenforceable by Uniform Commercial Code (U.C.C.) § 9-406(d)."  766 F. Supp. 2d at 317.

Accordingly, because the anti-assignment clause in the Procurement Agreement purported to prohibit an assignment of the JPM account without JPM's prior written consent, we find that it is invalid under N.Y. U.C.C. § 9-406(d)(1).  Therefore, the anti-assignment clause in the Procurement Agreement did not affect Wachovia's security interest in the JPM account or any subsequent assignments of that interest.[6]

### 2.   Whether the Second Assignment Was Valid

JPM next asserts that, even if the assignment from ImagePoint to Wachovia was valid, Wachovia's subsequent assignment of those rights to Haslam by way of the AASA was rendered null and void as the result of an anti-assignment clause contained in Wachovia's Loan and Security Agreement with ImagePoint.  See Def. Mem. at 10.  That clause states that Wachovia "may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement."  Loan & Security § 13.2(a).  The term "Eligible Assignees" is defined elsewhere in the agreement.  See id. at 11-12.  Plaintiffs do not assert that Haslam fits within any of the categories of Eligible Assignees.  Nevertheless, the Court finds the assignment to Haslam to be effective for at least two reasons.

Before reaching the merits of this issue, however, we must first determine what state's

---

[6] JPM asserts that plaintiffs should not be able to rely on N.Y. U.C.C. § 9-406(d)(1) because it was not cited in the complaint and "[n]ew claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss."  Def. Supp. Reply at 2 (quoting Zick v. Waterfront Comm'n of N.Y. Harbor, 2012 WL 4785703, at *3 (S.D.N.Y. Oct. 4, 2012)).  This argument is meritless.  Section 9-406(d)(1) is relevant not because it constitutes a separate cause of action but rather because it counters JPM's affirmative defense that plaintiffs' § 9-607 claim is unenforceable under the anti-assignment clause in the Procurement Agreement.  Thus, there was no need to plead it in the complaint.

law governs the construction of the Loan and Security Agreement.  Section 15.15 of the Loan and Security Agreement states: "This Agreement and the Notes shall be construed in accordance with and governed by the law of the State of Georgia."  Under New York's choice of law rules, "[a]bsent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."  Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir. 2000) (citation omitted).  Here, we see no reason why the contracting parties' choice to apply Georgia substantive law should not be honored given that Wachovia was located in Georgia, see Loan & Security § 15.1(b), and because there are no countervailing public policy considerations.

Applying Georgia law, the Court finds Wachovia's assignment to Haslam to be enforceable because the Loan and Security Agreement does not contain any language which specifically renders void an assignment by Wachovia that fails to comply with the Section 13.2 assignment clause.  In stark contrast, Section 13.1 of the Loan and Security Agreement specifically states that any improper assignment by ImagePoint "shall be null and void, and of no force or effect."  While Georgia law does not require that an anti-assignment clause "specify that any assignment is 'invalid,' 'void' or that the obligor has the right to disregard any assignment" in order to render an attempted assignment invalid, CGU Life Ins. Co. v. Singer Asset Fin. Co., LLC, 250 Ga. App. 516, 525 (2001), it still subscribes to the interpretive doctrine of expressio unius.  Under that doctrine, "when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded."  Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Const. Co., Inc., 932 F.2d 1443, 1449 (11th Cir. 1991); accord In re Celotex Corp., 487 F.3d 1320, 1334 (11th Cir. 2007); Covington Square Assocs., LLC v. Ingles Mkt., Inc., 283 Ga. App. 307, 310-11 (2007).  Here, the Loan and Security Agreement expressly

23

stated that an improper assignment by Imagepoint would be "null and void" but contained no such language in the provision regarding assignments by Wachovia.  This strongly suggests that the parties intended that only an improper assignment by ImagePoint would be rendered invalid and that an improper assignment by Wachovia would remain effective despite constituting a breach of the contract.  Accordingly, we conclude that, under the terms of Loan and Security Agreement, Wachovia's assignment to Haslam is valid and enforceable.

In the alternative, the Court finds that any defect in the assignment to Haslam was plainly waived by Imagepoint by virtue of the position it took in the bankruptcy proceedings.  Under Georgia law, "[i]t is well established that a party to a contract may waive a contractual provision for his or her benefit."  Forsyth Cnty. v. Waterscape Servs., LLC, 303 Ga. App. 623, 630 (2010). As the Georgia Court of Appeals notes:

> A waiver may be express, or may be inferred from actions, conduct, or a course of dealing.  Waiver of a contract right may result from a party's conduct showing his election between two inconsistent rights.  Acting on the theory that the contract is still in force, as by continuing performance, demanding or urging performance, or permitting the other party to perform and accepting or retaining benefits under the contract, may constitute waiver of a breach.  However, all the attendant facts, taken together, must amount to an intentional relinquishment of a known right, in order that a waiver may exist.

Greater Ga. Life Ins. Co., Inc. v. Eason, 292 Ga. App. 682, 687 (2008).  "While normally the question of waiver is a matter for the jury, where, as here, the facts and circumstances essential to the waiver issue are clearly established[,] waiver becomes a question of law."  Mauldin v. Weinstock, 201 Ga. App. 514, 520 (1991); accord Forsyth Cnty., 303 Ga. App. at 630.  Here, ImagePoint's trustee repeatedly acknowledged during the bankruptcy proceeding that Haslam was the "successor" to ImagePoint's rights.  See Trustee's Motion to Amend Cash Collateral Order, dated Jan. 1, 2011 (annexed as Ex. 3 to Awan Decl.), ¶ 1 ("James A. Haslam . . . is the

24

successor by way of assignment to [Wachovia] . . . and holds a first priority security interest in the Cash Collateral."); Agreed Order Amending the Amended Agreed Order Authorizing Use of Cash Collateral, dated May 10, 2011 (annexed as Ex. 4 to Awan Decl.), at 2 ("[Martin] is the assignee of James A. Haslam III, successor to [Wachovia] pursuant to the terms of an Assignment, Amendment and Settlement Agreement dated September 3, 2010, among [Wachovia] and [Haslam].").  Such conduct plainly demonstrates Imagepoint's intent to concede that the contractual assignment to Haslam was valid and "still in force."  Accordingly, Imagepoint waived any right it may have had to protest Wachovia's assignment to Haslam.

3.      Whether the Third Assignment Was Valid

JPM contends that, even if the assignment from Wachovia to Haslam was valid, Haslam's subsequent assignment of his rights to Martin was invalid because an anti-assignment provision of the AASA required Haslam to first receive Wachovia's written consent before making an assignment.  See Def. Mem. at 10-11.  The anti-assignment clause in the AASA states: "Without the prior written consent of Existing Agent and Existing Lender, Haslam shall not effectuate, or agree to make, any assignment of the Loan Documents or his rights or obligations thereunder."  AASA § 8(c).  The terms "Existing Agent" and "Existing Lender" both refer to Wachovia.  See AASA Preamble.

In response, plaintiffs assert that the assignment from Haslam to Martin was valid because Wachovia gave its prior written consent as required by the AASA.  See Pl. Mem. at 14-15.  In support of this assertion, Haslam's attorney produced an email signed by Wachovia attorney James Cretella which stated, "this email shall constitute [Wachovia's] consent, as required by Section 8(c) of the assignment agreement, to the assignment of the claim and loan documents referred to in the assignment agreement from James Haslam to James Martin."  See

25

Notice of Transfer of Claim Email, dated Apr. 6, 2011 (annexed as Ex. A to Declaration of Dean B. Farmer (annexed as Ex. 1 to Awan Decl.)).  As previously discussed, when considering a motion to dismiss for lack of subject matter jurisdiction, a court "may refer to evidence outside the pleadings," Makarova, 201 F.3d at 113, and such evidence "may be presented by affidavit or otherwise," Kamen, 791 F.2d at 1011.  JPM does not dispute that Wachovia gave its consent, let alone provide any evidence to the contrary.

Accordingly, the assignment to Martin was valid, and thus, Martin has made a sufficient showing of standing in this case.[7]

> 4.    Real Party In Interest

JPM makes the alternative argument that Martin cannot establish standing in these circumstances because Martin fails to satisfy the "Real Party In Interest Test."  See Def. Reply at 9-10; Def. Supp. Mem. at 4-5; Def. Supp. Reply at 5.  Specifically, JPM argues that Martin is not a real party in interest in this case because he has failed to prove that he "has the exclusive right to payment on any purported receivable from JPMorgan."  See Def. Supp. Mem. at 4 (citing Doble v. Deutsche Bank Nat'l Trust Co. (In re Doble), 2011 WL 1465559 (Bankr. S.D. Cal. Apr. 14, 2011)).  JPM contends, "it is not sufficient that Martin merely possesses a beneficial interest in the Accounts Receivable — Martin's interest in the Accounts Receivable must be 'such that recovery by [him] will protect [JPMorgan] from the claim of third persons.'"  Def. Supp. Reply at 5 (quoting Estate of Schmulevich v. Citibank, N.A., 1990 WL 160886, at *1 (S.D.N.Y. Oct.

---

[7] Because we have found sufficient grounds for determining that Martin has a valid interest in the JPM receivable by way of the chain of assignments, we need not consider plaintiffs' waiver or judicial estoppel arguments.  See Pl. Mem. at 15-19.  Additionally, we need not consider plaintiffs' argument that the settlement agreement during the Chapter 7 bankruptcy proceedings conferred on Martin an interest in the receivable.  See Pl. Mem. at 19-20.

18, 1990)).  In JPM's view, "[a]s a consequence of Wachovia's failure to properly transfer its

purported rights in the Accounts Receivable in accordance with Section 13.2 of the Loan and

Security Agreement . . . as well as Martin's failure to perfect his purported interest in the

Accounts Receivable, a recovery by Martin in this action would subject JPMorgan to the risk of

double liability."  Id.

As an initial matter, the Court rejects JPM's assertion that the real party in interest test is

governed by New York law.  See Def. Supp. Mem. at 4.  Instead, "[t]he question of which party

is the real party-in-interest is procedural, rather than substantive" and thus that "in diversity

cases federal law governs the issue of in whose name a lawsuit must be brought."  Brocklesby

Transp., A Div. of Kingsway Transps., Ltd. v. E. States Escort Servs., 904 F.2d 131, 133 (2d Cir.

1990); accord LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 180 F. Supp. 2d 465,

470 (S.D.N.Y. 2002) (same).  Under federal law, the real party in interest test requires only that

the "action must be brought by the person who, according to the governing substantive law, is

entitled to enforce the right."  Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 193 (2d Cir.

2003) (internal quotation marks and citation omitted); accord Park B. Smith, Inc. v. CHF Indus.

Inc., 811 F. Supp. 2d 766, 774 (S.D.N.Y. 2011) ("[T]he action must be brought by a person who

possesses the right to enforce the claim and who has a significant interest in the litigation.")

(internal quotation marks and citation omitted).  Moreover, it is well-established that a party who

has been properly assigned a right to collect upon an account is the real party in interest as to that

account.  See Deajess Med. Imaging, P.C. v. Allstate Ins. Co., 381 F. Supp. 2d 307, 311

(S.D.N.Y. 2005) (finding assignee to be the real party in interest because it had a "stake in this

litigation" and was not merely suing on behalf of the assignor); Italia Di Navigazione, S.p.A. v.

M.V. Hermes I, 564 F. Supp. 492, 493 (S.D.N.Y. 1983) ("As assignee, [the plaintiff] is a real

party in interest to assert these claims."); accord BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 949 F. Supp. 2d 486, 502 (S.D.N.Y. 2013) (noting that "under New York law, where an assignor assigns his right to pursue a claim to the assignee, the assignee is the 'real party in interest' and has standing to assert the injury in fact suffered by the assignor")

Here, having found that Martin has been properly assigned the right to ImagePoint's accounts receivable and that N.Y. U.C.C. § 9-607 provides him with the means to collect upon the JPM account as a secured creditor, we conclude that Martin is the "person who, according to the governing substantive law, is entitled to enforce the right." Oscar Gruss & Son, Inc., 337 F.3d at 193. Moreover, given the validity of the assignment, the cases JPM has cited on this point, see Def. Supp. Mem. at 4; Def. Supp. Reply at 5, are inapposite as they all involved situations where there was some flaw rendering the purported assignment invalid. Additionally, the fact that ImagePoint itself purported to transfer to Martin during the bankruptcy proceedings any remaining claim it might have had to the JPM account, see January 28 Settlement Agreement at 3, further demonstrates that Martin is in fact the real party in interest and is not simply attempting to bring this collection action as a representative of ImagePoint.

JPM suggests that Martin's failure to perfect his security interest in the JPM account "subjects JPMorgan to a risk of double recovery." Def. Supp. Mem. at 5. JPM relies on N.Y. U.C.C. § 9-318(b), which states, "[f]or purposes of determining the rights of creditors of, and purchasers for value of an account or chattel paper from, a debtor that has sold an account or chattel paper, while the buyer's security interest is unperfected, the debtor is deemed to have rights and title to the account or chattel paper identical to those the debtor sold." Despite the fact that Martin has not perfected his interest, we believe that Martin has provided sufficient evidence to prove that he is a real party in interest. JPM has been unable to produce any cases holding

that a party who has been assigned an enforceable security interest loses his status as a real party in interest simply because that party has failed to perfect the interest.  Indeed, as plaintiffs have argued, Pl. Supp. Reply at 9-10, case law suggests the opposite. Thus, in Wachovia Bank Nat'l Ass'n v. EnCap Golf Holdings, LLC, 690 F. Supp. 2d 311, 333 (S.D.N.Y. 2010), the court found that a plaintiff's failure to perfect its security interest did not affect its entitlement to collect on certain proceeds, asserting that "the secured creditor, even an unperfected secured creditor, has greater rights in its collateral than any other creditor, unless the Code provides otherwise." Because Martin has shown that he has a valid security interest in the JPM accounts, albeit an unperfected one, we find that Martin is a real party in interest with standing to proceed in this case.[8]

> B.    Failure to State a Claim

JPM argues that the Second Amended Complaint should be dismissed because it fails to state a claim pursuant to Fed. R. Civ. P. Rule 12(b)(6).  In considering such a motion a court must accept as true all of the allegations — though not the legal conclusions — contained in a complaint.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

---

[8] JPM contends that ImagePoint also lacks standing because "[f]ederal courts have uniformly held that any claims of a bankruptcy debtor that accrued pre-petition are property of the estate and may be pursued only by the duly-appointed trustee in a Chapter 7 bankruptcy case."  Def. Mem. at 2; see also id. at 11-12; Def. Reply at 14-15.  We need not address this issue, however, because it is well-established that where there is at least one plaintiff who has standing, a court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."  Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 n. 9 (1977); see also Horne v. Flores, 557 U.S. 433, 446 (2009); Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981) ("Because we find that [one plaintiff] has standing, we do not consider the standing of the other plaintiffs.").

cause of action will not do.") (citation, internal quotation marks, and brackets omitted).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678, and thus a court's first task is to disregard any conclusory statements in a complaint, id. at 681.

Next, a court must determine if a complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face."  Id. at 678 (citation and internal quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion.").  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged . . . . The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citations and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "'show[n]' — 'that the pleader is entitled to relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### 1.   In Pari Delicto Defense

JPM argues that, even if Martin does have standing, the second amended complaint should nevertheless be dismissed under the equitable doctrine of in pari delicto.  See Def. Mem. at 12-16.  As a procedural matter, an in pari delicto defense can sometimes be resolved on a motion to dismiss.  See e.g., Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 164 (2d Cir. 2003); In re Refco Sec. Litig., 779

F. Supp. 2d 372, 374 (S.D.N.Y. 2011).  While JPM cites to cases applying federal law in support of its argument, <u>see</u> Def. Mem. at 12-16, the claims in this case arise under New York's Uniform Commercial Code and common law, 2d Am. Compl. ¶¶ 18-28, and thus, we examine the applicability of the doctrine under New York law.

The <u>in pari delicto</u> doctrine under New York law provides that "parties to a fraudulent or illegal transaction who are <u>in pari delicto</u> may not invoke judicial aid to undo the consequences of their illegal acts." <u>Abright v. Shapiro</u>, 214 A.D.2d 496, 496-97 (1st Dep't 1995) (citation and internal quotation marks omitted).  JPM argues that the Court should not "'lend its good office' to award any recovery to Martin, who participated in wrongdoings against JPMorgan and other estate creditors." Def. Mem. at 3.  The alleged misconduct of Martin, however, has nothing to do with the claims in this case, which are based entirely on JPM's alleged refusal to pay the remaining balance that it owed ImagePoint under the Procurement Agreement.  <u>See</u> 2d Am. Compl. ¶¶ 5-6, 18-28.  Rather, the alleged misconduct consists exclusively of Martin's "(1) acquir[ing] an interest in the Receivable, to collect it for his own enrichment . . . and (2) eliminat[ing] at the same time a multi-million dollar liability under his personal guaranty executed in favor of Wachovia." Def. Mem. at 6.  In other words, JPM points to no fraud or illegality in the contract between Imagepoint and JPM.  Accordingly, the doctrine does not apply because the instant suit does not seek to "undo the consequences" of Martin's allegedly improper acts.  New York law is clear that "[a]n agreement which is lawful on its face" — here, the Procurement Agreement between JPM and Imagepoint — "and which does not contemplate or necessarily entail unlawful conduct in its performance is enforceable by the promisee even though he engages in unlawful activity in the agreement's performance." <u>Hilgendorf v. Hilgendorf</u>, 241 A.D.2d 481, 481-82 (2d Dep't 1997); <u>accord Globaltex Grp. Ltd. v. Trends</u>

Sportswear Ltd., 2010 WL 1633438, at *4 (E.D.N.Y. Apr. 21, 2010).  The Procurement

Agreement does not contemplate or necessarily entail any unlawful conduct and thus is

enforceable.[9]

> 2. Unjust Enrichment Claim

Lastly, JPM argues that plaintiffs' unjust enrichment claim, see 2d Am. Compl. ¶ 28,

must be dismissed because the Procurement Agreement was a valid and enforceable contract and

"it is black-letter law that 'the existence of a valid and binding contract governing the subject

matter at issue in a particular case does act to preclude a claim for unjust enrichment.'"  See Def.

Mem. at 16 (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp.

2d 162, 203 (S.D.N.Y. 2011)).  In response, Martin contends that his unjust enrichment claim

has been properly pleaded and that "a plaintiff may plead unjust enrichment as an alternative to a

breach of contract claim."  See Pl. Mem. at 28 (citing Breitman v. Xerox Educ. Servs., LLC,

2013 WL 5420532, at *4 (S.D.N.Y. Sept. 27, 2013)) .

---

[9] Notably, the same result would be reached under federal law.  See, e.g., BrandAid Mktg. Corp. v. Biss, 462 F.3d 216, 218 (2d Cir. 2006) ("[A]pplication of the [in pari delicto] doctrine requires that the plaintiff be an active, voluntary participant in the unlawful activity that is the subject of the suit.") (emphasis added, internal quotation marks and punctuation omitted); Nomura Sec. Int'l, Inc. v. E*Trade Sec., Inc., 280 F. Supp. 2d 184, 201 (S.D.N.Y. 2003) (in pari delicto did not apply because plaintiff's breach of contract claim against defendant was separate from the stock manipulation scheme of which plaintiff was allegedly involved).

In a footnote, JPM mentions that the "unclean hands" doctrine may also apply.  See Def. Mem. at 12 n.5.  New York's "unclean hands" doctrine, however, has the same limitation that dooms JPM's in pari delicto defense.  See, e.g., PHH Mortg. Corp. v. Davis, 975 N.Y.S.2d 480, 483 (3d Dep't 2013) (defense inapplicable because defendant failed to produce evidence that plaintiff's wrongful "conduct was directly related to or caused" the allegedly improper actions by defendant); Hytko v. Hennessey, 879 N.Y.S.2d 595, 600 (3d Dep't 2009) ("[E]quitable remedies are barred by the doctrine of unclean hands where the party seeking to assert them has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine.") (emphasis added).

"Under New York law, a claim of unjust enrichment requires simply an allegation that (1) the defendant was enriched, (2) the enrichment was at the plaintiff's expense, and (3) the defendant's retention of the benefit would be unjust."  Usov v. Lazar, 2013 WL 3199652, at *5 (S.D.N.Y. June 25, 2013) (internal quotation marks and citation omitted).  In circumstances where "the parties dispute whether there is an enforceable written contract at all . . . Rule 8(d)(2) of the Federal Rule of Civil Procedure permits a plaintiff to plead claims for breach of contract and, in the alternative, claims for quantum meruit and unjust enrichment."  Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 243 (S.D.N.Y. 2013).  However, where "there is a valid and enforceable contract between the parties, and the subject matter of the unjust enrichment claim is covered by the contract" the unjust enrichment claim must be dismissed.  CBS Broad. Inc. v. Jones, 460 F. Supp. 2d 500, 506 (S.D.N.Y. 2006) (dismissing plaintiff's unjust enrichment claim where neither side contested the validity of the contract); see also JTH Tax, Inc. v. Gouneh, 721 F. Supp. 2d 132, 139 (N.D.N.Y. 2010) ( "While it is generally impermissible to seek damages in an action sounding in quasi contract where the existence of [a valid written agreement] is undisputed, . . . unjust enrichment may be pleaded in the alternative to a claim for breach where the existence of a valid agreement is in dispute.") (internal punctuation and citations omitted).

In this case, JPM has admitted that it entered into the Procurement Agreement with ImagePoint and has not contested the contract's validity.  See Answer to Second Amended Complaint, filed Aug. 19, 2013 (Docket # 45), ¶ 3.  In light if this admission, plaintiffs' unjust enrichment claim must be dismissed.

IV.   CONCLUSION

For the aforementioned reasons, JPM's motion to dismiss the second amended complaint (Docket # 47) should be denied except plaintiffs' claim for unjust enrichment should be

dismissed pursuant to Fed. R. Civ. P. Rule 12(b)(6).

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: June 25, 2014
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

34